IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 8, 2016 Session

## STATE OF TENNESSEE v. JAVONTA MARQUIS PERKINS

**Appeal from the Criminal Court for Davidson County**
**No. 2012-C-2144    J. Randall Wyatt, Jr., Judge**

_____

### No. M2015-02423-CCA-R3-CD

_____

Defendant, Javonta Marquis Perkins, was indicted by the Davidson County Grand Jury for aggravated robbery, carjacking, and possession of a weapon during the commission of a dangerous felony. Defendant was convicted as charged by a jury and sentenced by the trial court to ten years each for his aggravated robbery and carjacking convictions and six years for the possession of a weapon conviction. By operation of law, the trial court ordered Defendant's six-year sentence consecutive to his concurrent ten-year sentences, for an effective sentence of 16 years. In this appeal as of right, Defendant contends that: 1) the trial court erred by denying his motion to suppress the victim's pretrial identification; 2) the trial court erred by instructing the jury on criminal responsibility; 3) the evidence was insufficient to support his convictions; and 4) his sentences are excessive. Having reviewed the entire record and the briefs of the parties, we find no error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Richard C. Strong, Nashville, Tennessee, for the appellant, Javonta Marquis Perkins.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Glenn R. Funk, District Attorney General; and Jude Santana, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Suppression hearing*

On March 3, 2012, at approximately 1:45 a.m., Maurice Hegwood parked in the driveway of his parents' residence. When he got out of his car, two men approached him, and one of the men held a gun to his head and ordered him to get on the ground. He asked Mr. Hegwood whether anyone was in the house, and he replied that his parents were inside. The gunman grabbed Mr. Hegwood's keys from him and gave them to the other man. The other man was trying to back Mr. Hegwood's car out of the driveway, and "he kept hitting the house back and forth." The gunman yelled at the other man, "You don't know how to f***ing drive." Mr. Hegwood's vehicle was a 2009 Pontiac G6 that he had purchased three days prior to the incident. After the other man backed the car out of the driveway, the gunman got into the driver's seat, fired a shot into the air, and the two men drove away. Mr. Hegwood testified that the incident lasted 10-15 minutes.

Mr. Hegwood testified that he gave a detailed description of the gunman to the police. He told the officer who responded that the gunman was wearing a white t-shirt and blue jeans and that he had dreadlocks in his hair. He told the officer that the other man wore a blue shirt and jeans and that the gunman was taller and older than the other man. He told police that he believed the weapon was a semi-automatic.

Mr. Hegwood testified that the police contacted him to tell him that his car had been located. He testified,

> I remember getting a call to tell me he said, "He had good news and bad news, what do I want first?" And I said, "It doesn't matter." He said, "Okay, I will give you the bad news. We got him. He tried to run. The car was wrecked and the car is totaled[,]" and he told me where it was[,] and that is where I went.

Mr. Hegwood drove his father's vehicle to the scene of the crash and identified his car as it was being searched and towed from the scene. Mr. Hegwood was then told to go to the hospital. When he arrived at the hospital, he saw someone in a room connected to the emergency room waiting area, and he recognized the person as the gunman. Mr. Hegwood told the police, "that's him." Mr. Hegwood did not recall whether Defendant was handcuffed. He did not see any shackles. Mr. Hegwood saw Davidson County Sheriff's Office officers patrolling the area. He testified that it was approximately two hours after the incident when he identified Defendant at the hospital.

Mr. Hegwood denied that a police officer advised him at the hospital that they had a suspect. He testified that he was advised by an officer at the hospital about a "four-hour rule" regarding show-up identifications, but he "didn't have a real understanding [of] what they w[ere] talking about at the time."

Mr. Hegwood identified Defendant at the suppression hearing as the person who robbed him at gunpoint and testified that he was "one-hundred percent" certain of his identification.

Mr. Hegwood testified that he is an employee of the Davidson County Sheriff's Office, and his duties include the management of legal mail. He had seen Defendant several times since Defendant came into custody. After Mr. Hegwood realized who Defendant was, he informed his supervisor, who took steps to ensure that Mr. Hegwood did not have further contact with Defendant.

Officer Nicholas Carter, of the Metro Nashville Police Department ("MNPD"), responded to the aggravated robbery call on March 3, 2012. He arrived at Mr. Hegwood's residence between 1:50 and 2:00 a.m. He testified that Mr. Hegwood gave "[v]ery good" descriptions of the two perpetrators. Mr. Hegwood indicated that he believed he could identify the gunman, but that he did not believe he could identify the other man. Officer Carter testified that the area where the robbery occurred was "fairly well-lit." Mr. Hegwood also gave a description of his vehicle. At 2:55 a.m., Officer Carter saw the vehicle with two people inside. He followed the car for approximately five minutes. When a backup officer arrived, Officer Carter and the other officer attempted to stop the vehicle, and the vehicle fled. The officers pursued the vehicle, and it crashed into a wooded area. Officer Carter did not see the occupants of the vehicle exit the vehicle. Two other K-9 officers apprehended two suspects approximately 30 minutes after the crash, and they were taken to the hospital for injuries sustained in the crash, and both suspects had been bitten by the K-9.

Officer Carter called Mr. Hegwood and told him that his car had been located and that it had been "totaled." Officer Carter met Mr. Hegwood at the entrance of the hospital, and they "spoke for a minute." Officer Carter testified that Mr. Hegwood looked in "room 9" where suspects are usually transported and "immediately identified the defendant." Officer Carter denied that he told Mr. Hegwood that suspects are taken to that room. Officer Carter testified that Mr. Hegwood seemed "[v]ery confident" in his identification. Officer Carter testified that Defendant's description of the gunman was consistent with Defendant's appearance.

Officer Carter testified on cross-examination that he "specifically remember[ed]" telling Mr. Hegwood that the police had found his vehicle and that it was "totaled." He

did not recall whether he told Mr. Hegwood that the suspects had been detained or whether he told him to come to the hospital to identify them. Officer Carter testified that there were three to five officers present in "room 9" for security and not related to the incident involving Mr. Hegwood. Officer Carter did not recall whether he discussed the "four[-]hour rule" with Mr. Hegwood. Officer Carter testified that Defendant was handcuffed to the gurney.

At the conclusion of the hearing, the trial court found that Mr. Hegwood's opportunity to view the Defendant during the aggravated robbery "was pretty good[;]" that Mr. Hegwood's description of Defendant was consistent with Defendant's appearance; and that Mr. Hegwood's level of certainty in his identification of Defendant as the gunman was "100 percent[.]" The trial court also concluded that Mr. Hegwood's identification of Defendant was not the result of police suggestion. The trial court denied Defendant's motion to suppress.

*Trial*

Mr. Hegwood and Officer Carter's testimony at trial was substantially the same as their testimony at the suppression hearing. Mr. Hegwood, an employee of the Davidson County Sheriff's Office, testified that on March 3, 2012, at 1:40 a.m., he was robbed at gunpoint in the driveway of his parents' home by two men. The men stole his Pontiac G-6 that he purchased the day before for $13,500. His wallet, a laser pointer, and several compact discs were inside his car.

Mr. Hegwood testified that the driveway was well-lit with motion detection flood lights, a porch light near the garage and street lighting. Mr. Hegwood testified that he got a good look at the gunman. Mr. Hegwood identified Defendant as the gunman at trial.

Mr. Hegwood testified that Defendant pointed a gun at his head and told him "to get on the ground." Defendant asked Mr. Hegwood if anyone was inside the house. Mr. Hegwood replied that no one was inside because he did not want the men to harm his parents. Defendant took Mr. Hegwood's keys from his pocket and threw them to the other man. Defendant asked Mr. Hegwood again if anyone was inside the house, and Mr. Hegwood told him that his parents were inside. Defendant told him, "'I ought to kill ya for lying.'" Mr. Hegwood testified that he was afraid Defendant would shoot him. Mr. Hegwood looked up at Defendant while Defendant was standing over him, and Defendant told him not to look at him again. The other man tried to back Mr. Hegwood's car out of the driveway, and he hit the corner of the house, damaging the car and the house. Defendant fired a shot into the air and got into the car, and they two men drove away.

- 4 -

Mr. Hegwood called 9-1-1 to report the incident. When Officer Carter arrived, Mr. Hegwood gave him a description of the gunman. He told Officer Carter that he was wearing a white t-shirt and jeans, that he had dreadlocks, and that he was taller than the other man. After he identified his car at the scene of the crash, Mr. Hegwood went to the hospital, where he saw and identified Defendant as the gunman. Mr. Hegwood testified that Officer Carter walked towards him as he entered the hospital through the emergency room area. Mr. Hegwood saw Defendant in a room approximately 10 to 15 feet away. He told Officer Carter, "that is him in the room."

Mr. Hegwood acknowledged that there were several police officers standing in the hallway. Mr. Hegwood could not recall who called him or why he was asked to come to the hospital. He also could not recall whether he was told that the suspects had been caught. He testified that no one suggested or invited him to identify Defendant. Mr. Hegwood testified that he is "100 percent" certain of his identification of Defendant as the gunman.

Mr. Hegwood described his job at the Davidson County Sheriff's Office and testified that when he saw Defendant at a facility in early 2014, he told his supervisor and took measures so that they would not have contact with each other.

Officer Carter arrived at the scene a few minutes after Mr. Hegwood called 911. He took a report from Mr. Hegwood in the driveway. The area was well lit from a light on the house and a street light, and Officer Carter did not need a flashlight to write the report. Mr. Hegwood gave descriptions of his vehicle and the two perpetrators. Mr. Hegwood gave a more detailed description of the gunman. He described the gunman as an African-American male with medium length dreadlocks, wearing a white shirt and blue jeans, and he was taller than the other man. Mr. Hegwood told Officer Carter that he believed he would be able to identify the gunman, but not the other man.

Approximately one hour after Officer Carter left Mr. Hegwood's parents' residence, he observed Mr. Hegwood's vehicle. He observed two people inside the vehicle. Officer Carter followed the car and waited for backup officers to arrive. When Officer Steven Spillers arrived, the two officers activated their emergency lights and siren and attempted to stop the vehicle. The driver failed to stop. He drove through a parking lot and over a curb, and the car went airborne and wrecked in the woods. Officer Carter went to the crash site. He did not recall how many people exited the vehicle, but he could hear people running through the brush. He acknowledged that he testified at a prior hearing that he saw two people exit the car. Officer Carter testified that the area where the wreck happened was so dense, he stayed with his vehicle. Officer Carter was not present when Defendant and his co-defendant, Quentin McClain, were apprehended. He saw both men after they were apprehended. He testified that Defendant was "a young

black male, kind of medium length dreads, . . . fairly slim, 5'7", 5'8"ish." Defendant was wearing a white shirt. Both men were transported to the hospital.

Officer Carter did not recall whether he told Mr. Hegwood to go to the hospital or whether he told Mr. Hegwood that the two people arrested had been taken to the hospital. Officer Carter met Defendant inside the entrance of the ER at the hospital and had "a brief conversation with him." Officer Carter told Mr. Hegwood that he was sorry about his car, and "that is when he looked into the room." Officer Carter testified that Defendant was handcuffed to a hospital gurney. Officer Carter testified that he did not include in his police report that Mr. Hegwood identified Defendant at the hospital as the gunman. Officer Carter testified that it "was a mistake" not to include that information and that he expected Detective Haney to include it in the affidavit of complaint. Officer Carter denied that he told Mr. Hegwood that Defendant was at the ER and that he asked Mr. Hegwood to identify anyone. Officer Carter acknowledged that he called Mr. Hegwood and that Mr. Hegwood went to the hospital, but he testified that he "d[id]n't know" why Mr. Hegwood went to the hospital.

Officer Steven Spillers of the MNPD responded to Officer Carter's call that he had spotted the suspect vehicle. Officer Spillers observed two men in the vehicle and damage on the driver's side rear door, which supported Mr. Hegwood's statement that the car was damaged when the suspects hit the side of the house backing out of the driveway. Officer Spillers and Officer Carter followed the suspect vehicle, and both officers activated their lights and sirens. The driver refused to stop and attempted to make a left turn. The driver lost control of the vehicle, jumped a curb, and hit a concrete embankment. The vehicle landed in a densely wooded area. Officer Spillers testified that "the whole thing was pretty quick."

Officer Spillers saw only one person exit the vehicle following the crash. Officer Spillers heard someone running through the woods. He ordered the person to stop, but the person did not stop. Officer Spillers returned to the suspect car and waited for K9 officers to arrive. Officer Spillers testified that there were no other occupants in the car. He found a Smith and Wesson semi-automatic handgun near the front passenger side door of the car.

Sergeant Corey Sanderson of the MNPD testified that he was driving towards the suspect vehicle while Officers Carter and Spillers were in chase, and the suspect vehicle drove into his lane of traffic at a high rate of speed and almost hit him head-on. Sergeant Sanderson testified that he could see clearly into the car as it drove past. He saw two occupants in the front seat. Sergeant Sanderson turned his vehicle around and saw the suspect vehicle crash.

Sergeant Sanderson parked on the street beside the wooded area. He saw two men leave the wooded area, and he pursued them on foot. He testified that he never lost sight of the two men until the K9 officer arrived. Sergeant Sanderson stopped his pursuit of the suspects when the K9 officer arrived so as not to disturb the scent. At trial, Sergeant Sanderson identified Defendant as one of the suspects he chased.

Officer Jerry Denton testified that he and another K9 officer responded to the scene of the crash. When he arrived, he saw one suspect run out of the woods, and he ordered him to stop, but the suspect ignored him. The police dog tracked the suspect, and the suspect was apprehended. The K9 officers then tracked the other suspect and apprehended him in the woods nearby. At trial, Officer Denton identified Defendant as the second suspect apprehended.

Dr. Jeffrey Neuschatz testified for the defense as an expert in eyewitness identification. Dr. Neuschatz testified that eyewitness identification can be affected by a number of factors, including exposure time, viewing conditions, and stress levels. Dr. Neuschatz reviewed the police reports, witness statements, and transcripts of prior hearings in this case. He characterized the incident in this case as "a high stress situation." Dr. Neuschatz testified that research shows eyewitness identifications in stressful situations tend to be less reliable. He also testified that when a weapon is present, it increases the stress level of the eyewitness, and "people look at the weapon and because they are looking at the weapon they are not looking at other aspects of the scene and their memory for those other aspects suffers." Dr. Neuschatz testified that a person's confidence in his or her identification does not necessarily indicate an accurate identification. Dr. Neuschatz testified that a "line-up" identification, with six or more suspects, is "much more reliable" than a "show-up" identification, in which only one suspect is presented for identification. Dr. Neuschatz acknowledged that better lighting conditions "will increase the reliability of the identification." He also agreed that Mr. Hegwood and the gunman were in close proximity during the incident, and that would increase the reliability of the identification.

Defendant did not testify or present any other proof.

### Sentencing hearing

At the sentencing hearing, Mr. Hegwood testified that his mother had spinal stenosis and was unable to walk. He testified that she was "really a nervous type right now." He testified that his father was also more nervous since the incident and avoided leaving his house after dark. Mr. Hegwood testified that the incident had changed his "whole mindset" and that he was more cautious of his surroundings and frequently changed his routine.

Mr. Hegwood testified that he "just want[ed] justice served" in this case and for Defendant "to pay for what" he had done. Mr. Hegwood testified that he had missed three to four weeks of work as a result of the incident. He testified that he was "just ready to get on with [his] life."

A presentence report was admitted into evidence. The report showed that Defendant had prior convictions for misdemeanor theft and driving on a suspended, cancelled, or revoked license. Defendant also had two pending cases in which he was charged with aggravated robbery and robbery.

Carbreathia Huddleston, Defendant's mother, testified that Defendant was 16-years-old at the time of sentencing. She described Defendant as a "regular teenager" who participated in sports and was helpful around the house. She testified that she did not have "any problems with him." Ms. Huddleston testified that Defendant's father had little or no contact with Defendant. She testified that she had raised Defendant by herself. She typically worked 50-60 hours per week, and there had been times when she worked two jobs to support her family.

Ms. Huddleston testified that on the night of the incident, Defendant had plans to go to his friend's house. She testified that she knew Defendant's co-defendant Quentin McClain "very well" and that he and Defendant attended the same school. Ms. Huddleston testified that she did not "discount Mr. Hegwood's belief that it was [Defendant]" who robbed him at gunpoint, she "strongly fe[lt] that this is something that [Defendant] didn't do[.]" She testified that Defendant continued to live with her after he was released on bond, and she acknowledged that he was subsequently charged with aggravated robbery and robbery in separate cases.

## Analysis

### Motion to suppress

Defendant contends that the trial court erred by denying his motion to suppress the victim's out-of-court identification of him as one of the perpetrators. Defendant argues that the identification was unduly suggestive and unreliable. The State responds that the victim's identification was reliable and therefore properly admitted.

In reviewing a trial court's decision on a motion to suppress, we review the trial court's legal conclusions de novo. *State v. Northern*, 262 S.W.3d 741, 747 (Tenn. 2008). In doing so, we give deference to the trial judge's findings of fact unless the evidence preponderates otherwise. *Id*.; *see State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001); *State*

*v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "'[C]redibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'" *Northern*, 262 S.W.3d at 747-48 (quoting *Odom*, 928 S.W.2d at 23). In reviewing the findings of fact, evidence presented at trial may "'be considered by an appellate court in deciding the propriety of the trial court's ruling on the motion to suppress.'" *State v. Garcia*, 123 S.W.3d 335, 343 (Tenn. 2003) (quoting *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)). The prevailing party on the motion to suppress is afforded the "'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *Northern*, 262 S.W.3d at 748 (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)); *see State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000); *Odom*, 928 S.W.2d at 23.

Due process is violated if an identification procedure is: (1) unnecessarily or impermissibly suggestive and (2) gives rise to a "very substantial likelihood of irreparable misidentification." *Simmons v. U.S.*, 390 U.S. 377, 384 (1968). In *Neil v. Biggers*, 409 U.S. 188, 199 (1972), the United States Supreme Court established a two-part test to determine when a defendant's due process rights have been violated by a pretrial identification. Under this test, the court first considers whether the identification procedure itself was unduly or unnecessarily suggestive. *Id.* If the identification procedure is found to have been suggestive, the court next considers "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." *Id.* (internal quotations omitted); *see also Stovall v. Denno*, 388 U.S. 293, 302 (1967) (stating that "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it"), *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314, 326 (1987).

The factors to be considered in evaluating the reliability of an identification obtained as part of a suggestive identification procedure include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *See Biggers*, 409 U.S. at 199-200. The corrupting effect of the suggestive procedure is weighed against these factors. *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

There is, however, no need for the court to apply the totality of the circumstances test outlined in *Biggers* if it first determines that the identification procedure itself was neither unnecessarily or impermissibly suggestive nor likely to create a substantial likelihood of irreparable misidentification. *See State v. Biggs*, 211 S.W.3d 744, 749 (Tenn. Crim. App. 2006) (citations omitted).

Defendant asserts that the pretrial identification procedure used by police in this case was a "show-up." "A 'show-up,' also referred to as a one-on-one confrontation, occurs when 'a single person is presented as a suspect to a viewing eyewitness.'" St*ate v. Thomas*, 780 S.W.2d 379, 381, n. 1 (Tenn. Crim. App. 1989). Show-up identification procedures have been considered to be "inherently suggestive and unfair to the accused." *Id*. at 381. Accordingly, they have been roundly condemned as a method of establishing a perpetrator's identity, unless "(a) there are imperative circumstances which necessitate a showup, or (b) the showup occurs as an on-the-scene investigatory procedure shortly after the commission of the crime." *Id*.

In denying the Defendant's motion to suppress, the trial court found that Mr. Hegwood's identification of Defendant at the hospital was not inherently suggestive:

> [W]hile the victim was asked by the police to come to the hospital, there is no evidence that Officer Carter or any other officer arranged for the victim to view the Defendant in the hospital room. The Court finds that the victim's viewing the Defendant occurred spontaneously, and not at the direction or request of any law enforcement officer. Therefore, the Court finds that the identification was not the product of an inherently suggestive showup.

We conclude that the evidence does not preponderate against the trial court's finding. Mr. Hegwood and Officer Carter denied that Officer Carter or another officer led Mr. Hegwood to the room where Defendant was being treated and asked him to identify the perpetrator. Moreover, even if Mr. Hegwood's viewing of Defendant was a "show-up" or arranged by police, considering the *Biggers* factors, Mr. Hegwood had ample opportunity to view the gunman, who was in close proximity to him in a well-lit area; his attention was concentrated on the gunman because he was armed, and Mr. Hegwood was fearful; Mr. Hegwood provided a detailed description of the gunman to the police; Mr. Hegwood expressed his certainty in his identification of Defendant as the gunman; and his recognition of Defendant at the hospital occurred within a short time after the incident in his parents' driveway.

We can find no error in the trial court's ruling. Defendant is not entitled to relief on this issue.

*Criminal responsibility jury instruction*

Defendant contends that the trial court erred by instructing the jury on criminal responsibility because it was not the principal theory advanced by the State for the

conviction and therefore not fairly raised by the evidence. The State responds that the trial court properly instructed the jury on criminal responsibility.

Defendant acknowledges that there was no contemporaneous objection to the instruction and asserts that he is entitled to relief under plain error review. The State submits that the issue is subject to plenary review under *State v. Faulkner*, 154 S.W.3d 48 (Tenn. 2005). We agree with the State. Because Defendant is challenging an erroneous jury instruction rather than an incomplete jury instruction, Tenn. R. Crim. P. 30(b) allows this issue to be raised for the first time in a motion for new trial. *Faulkner*, 154 S.W.3d at 58. Therefore, Defendant's failure to make a contemporaneous objection to the alleged erroneous instruction does not result in waiver of the issue. *State v. Ramone Lawson*, No. W2013-00324-CCA-R3-CD, 2014 WL 1153268, at *4 (Tenn. Crim. App., Mar. 19, 2014), *perm. app. denied* (Tenn., Aug. 26, 2014).

It is well-recognized that a defendant in a criminal case "has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); *see State v. Leath*, 461 S.W.3d 73, 105 (Tenn. Crim. App. 2013). When reviewing jury instructions on appeal to determine whether they are erroneous, this court must "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997). A jury instruction is considered "prejudicially erroneous" only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id*. Because the propriety of jury instructions is a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

A trial court may commit error by instructing a jury on the theory of criminal responsibility where the evidence presented does not support such a theory of guilt. *See State v. Hatcher*, 310 S.W.3d 788, 811 (Tenn. 2010). Tennessee Code Annotated section 39-11-402(2) provides that a person is "criminally responsible for an offense committed by the conduct of another, if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense . . . ." "[C]riminal responsibility is not a distinct, separate crime" but rather "a theory by which the State may hold the defendant liable for the principal offense committed by another." *State v. Lemacks*, 996 S.W.2d 166, 173 (Tenn. 1999).

A jury instruction on criminal responsibility should be given only when the "'issue is fairly raised by the evidence.'" *State v. Little*, 402 S.W.3d 202, 217 (Tenn. 2013) (quoting *State v. Andrew L. Collins*, No. M2005-01685-CCA-R3-CD, 2006 WL 2380610,

at *4 (Tenn. Crim. App., Aug. 15, 2006), *perm. app. denied* (Tenn., Dec. 27, 2006)). "'[I]f the evidence is insufficient to support an alternative legal theory of liability, it would generally be preferable for the court to give an instruction removing that theory from the jury's consideration.'" *Hatcher*, 310 S.W.3d at 812 (quoting *Griffin v. U.S.*, 502 U.S. 46, 60 (1991)). However, "the State need not elect between prosecution as a principal actor and prosecution for criminal responsibility[.]" *State v. Hodges*, 7 S.W.3d 609, 625 (Tenn. Crim. App. 1998); *State v. Charlie W. Dunn*, No. 88-241-III, 1990 WL 40988, at *3 (Tenn. Crim. App. Apr. 11, 1990) (concluding that jury did not have to find which defendant was the principal offender and which was the aider because the evidence established that one or both of the appellants committed the crime and the other was criminally responsible).

Criminal responsibility was fairly raised by the proof in this case. The evidence showed that two people approached the victim in the driveway of his parents' home in the middle of the night with the intent to rob him. Although the victim identified Defendant as the gunman, both perpetrators stole and drove away with the victim's car. Both perpetrators occupied the victim's stolen car and fled from the car after a police chase and refusal to stop. Based on the proof, the trial court's instruction to the jury on criminal responsibility was proper, and the evidence was sufficient to support a conviction under a theory of criminal responsibility. Defendant is not entitled to relief on this issue.

*Sufficiency of the evidence*

Defendant contends that the evidence was insufficient to support his convictions. Defendant argues that because the victim's pretrial identification of him at the hospital was impermissibly suggestive and unreliable, the proof was insufficient to establish his identity as the perpetrator of the offenses.

We review Defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id*. Questions concerning the credibility of the witnesses, the weight and value of the

evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

Aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" that is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" T.C.A. § 39-13-401, -402. Carjacking is defined as "the intentional or knowing taking of a motor vehicle from the possession of another by use of: (1) A deadly weapon; (2) or Force or intimidation." T.C.A. § 39-13-404(a). "It is an offense to possess a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony." T.C.A. § 39-17-1324(a).

The identity of the perpetrator "is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). The identification of a defendant as the person who has committed the crime(s) for which he is on trial is a question of fact for the jury's determination. *State v. Toomes*, 191 S.W.3d 122, 129 (Tenn. Crim. App. 2005). The State bears the burden of proving a defendant's identity as the perpetrator of the charged offense. *White v. State*, 533 S.W.2d 735, 744 (Tenn. Crim. App. 1975). The jury determines whether the State has met this burden. *State v. Phillips*, 728 S.W.2d 21, 25 (Tenn. Crim. App. 1986); *State v. Vaughn*, 29 S.W.3d 33, 40 (Tenn. Crim. App. 1998). Furthermore, "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The conviction replaces the presumption of innocence with a presumption of guilt, and the accused has the burden of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Viewing the evidence in the light most favorable to the State, the proof showed that Defendant and his co-defendant approached the victim in the driveway of his parents' home, pointed a gun at his head, and ordered him to the ground. The victim, fearful that Defendant would shoot him and harm his parents inside, complied. The victim testified that the driveway was well-lit and that he got a good look at Defendant and that Defendant even ordered the victim to stop looking at him. Defendant threatened to kill the victim and fired a shot into the air as he drove away with the co-defendant in the victim's car. Defendant and the co-defendant were apprehended a short distance from the victim's wrecked car. The victim gave a description of Defendant to Officer Carter and later identified Defendant at the hospital. The description the victim gave matched Defendant's appearance. The victim also unequivocally identified Defendant at trial.

- 13 -

The evidence is sufficient to sustain Defendant's convictions. Defendant is not entitled to relief on this issue.

*Length of sentence*

Defendant contends that the trial court abused its discretion by imposing ten-year concurrent sentences for his aggravated robbery and carjacking convictions. Defendant argues that his sentence is excessive because he was 16-years-old at the time of the offenses and his sentence is disproportionately higher than the sentence received by his co-defendant, Quentin McClain.

Although the Defendant concedes that the trial court imposed sentences that are within the appropriate sentencing ranges, he argues that his sentence is excessive and is not the least severe measure necessary to achieve the purposes for which the sentence was imposed.

When a defendant challenges the length of a sentence that falls within the applicable statutory range and reflects the purposes and principles of sentencing, the appropriate standard of appellate review is abuse of discretion accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 706-07 (Tenn. 2012). In determining what sentence a defendant should receive within a particular range, the trial court considers the evidence presented at the sentencing hearing, the pre-sentence report, any sentencing alternatives, the nature of the criminal conduct, statutory mitigating and enhancement factors, statistical information provided by the administrative office of the courts, and any statement made by the defendant. T.C.A. § 40-35-210(b)(1)-(7). The defendant bears the burden of demonstrating the impropriety of a sentence on appeal. T.C.A. § 40-35-401, Sentencing Comm'n Cmts.

Defendant does not dispute his status as a Range I, Standard Offender, which subjected him to a sentencing range of eight to 12 years for each Class B felony conviction. T.C.A. §40-35-112(a)(2). Defendant received concurrent ten-year sentences for aggravated robbery and carjacking, both Class B felonies. The trial court stated on the record its reasons for imposing the sentence. Specifically, the trial court found two enhancement factors: Defendant had a previous history of criminal convictions in addition to those necessary to establish the appropriate range, and he was a leader in the commission of an offense involving two or more criminal actors. *See* T.C.A. § 40-35-114(1), (2). Defendant does not dispute the trial court's application of the two enhancement factors. Rather, he contends that the trial court abused his discretion because Defendant was 16-years-old at the time of the offenses, and there was a disparity between his sentence and the sentence of his co-defendant, McClain, who was 14-years-old at the time of the offenses.

The State contends that the proof did not support a mitigation of Defendant's sentence because he lacked substantial judgment due to his youth. *See* T.C.A. § 40-35-113(6). A defendant's age is one of many factors to be considered in determining whether he lacked substantial judgment. *State v. Turner*, 41 S.W.3d 663, 674 (Tenn. Crim. App. 2000) ("the defendant's age, education, maturity, experience, mental capacity or development, and any other pertinent circumstance tending to demonstrate the defendant's ability to appreciate the nature of his conduct" should be considered when determining the application of mitigating factor (6)).

There is nothing in the record to suggest that Defendant lacked substantial judgment or the ability to appreciate the nature of his conduct because of his age. We conclude that the trial court did not abuse its discretion in imposing Defendant's sentences. Defendant is not entitled to relief on this issue.

CONCLUSION

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE